Carson Wayne NEWTON, Plaintiff,

v.

UNIWEST FINANCIAL CORP., a corporation; United Savings Bank of Wyoming, F.S.B., a Federal stock savings bank; Uniwest Service Corp., a corporation; Uniwest Mortgage Company, a corporation; the Federal Deposit Insurance Corporation, an agency of the United States, as Receiver for Buena Vista Bank and Trust Co.; Mark Perlmutter and Gary H. McGill, Defendants.

No. CV–S–87–706 HDM.

United States District Court, D. Nevada.

July 11, 1990.

Peter C. Bernhard, Charlotte M. Matanane, Schreck, Jones, Bernhard, Woloson & Godfrey, Las Vegas, Nev.

David W. Stark, Kristen Mix Myer, Otten, Johnson, Robinson, Neff & Ragonetti, Denver, Colo.

Gary R. Goodheart, Jones, Jones, Close & Brown, Chartered, Las Vegas, Nev.

William E. Murane, Jack M. Englert, Jr., Holland & Hart, Denver, Colo.

Jodi E. Raizin, Sully, Lenhard & Raizin, Las Vegas, Nev.

James M. Lyons, Patrick M. Flaherty, Rothberger, Appel, Powers & Johnson, Denver, Colo.

Bruce M. Judd, Wright & Stewart, Las Vegas, Nev.

Kevin Michael Shea, Holme Roberts & Owen, Denver, Colo.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER RE DEFENDANT GARY H. MCGILL'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

McKIBBEN, District Judge.

The Court having considered the pleadings, depositions, answers to interrogatories, and affidavits on file together with the memorandum briefs and memoranda of points and authorities of all of the parties regarding the Defendant Gary H. McGill's Motion to Dismiss and Motion for Summary Judgment Regarding Counts II, III, V, and VII of Plaintiff's First Amended Complaint and having heard oral argument on this Motion on March 22, 1990, and now being fully advised in the premises makes the following Findings of Fact, Conclusions of Law and Order.

## PARTIES' CLAIMS AND PROCEDURAL BACKGROUND

Plaintiff Carson Wayne Newton ("Plaintiff") commenced this action in September, 1987 against, among others, Defendants Uniwest Financial Corporation ("UFC"), Uniwest Service Corporation ("USC"), Uniwest Mortgage Company ("UMC") and former Defendant United Savings Bank of Wyoming [1] ("USB") and Gary H. McGill and Mark Perlmutter. Mr. McGill was President of UFC and United Savings and Mr. Perlmutter was Chairman of UFC.[2] Plaintiff filed and served his "First Amended Complaint for Rescission, Damages and Injunctive Relief" on or about July 8, 1988. Plaintiff alleges that in late 1984 he was contacted regarding participating in the

---

1. On December 15, 1988, the Federal Savings & Loan Insurance Corporation ("FSLIC") was appointed as receiver for United Savings Bank of Wyoming, which was immediately acquired by Rocky Mountain Federal Savings and Loan Association and which became known as "Rocky Mountain, F.S.B." (Exhibit A). Rocky Mountain, F.S.B. was substituted as a party in this action by the Court's Order dated September 25, 1989.

2. This action has been stayed as to Mr. Perlmutter by virtue of the automatic stay issued by the United States Bankruptcy Court for the District of Colorado.

formation of a limited partnership, Fiesta R.V. Resort, Ltd. ("Fiesta"), to acquire and to develop real estate in Bullhead City, Arizona for use as a recreational vehicle park. The limited partnership was formed with Plaintiff as a limited partner. (Amended Complaint, ¶ 13). Plaintiff claims that the Fiesta promoter John Keilly contacted USC to obtain a loan to finance acquisition of the land by Fiesta. He also claims that UFC agreed to finance the land acquisition on the condition that the Fiesta limited partners purchase 17,500 shares of UFC's Series B Preferred Stock at a cost of $1,750,000. Plaintiff further claims that his share of that obligation was to purchase 5,000 shares of the UFC Preferred Stock at a cost of $500,000. (Amended Complaint, ¶ 14). Plaintiff claims that he borrowed $300,000 from Defendant USC and $200,000 from Defendant Buena Vista Bank and Trust Co. ("Buena Vista") in January 1985. Plaintiff asserts that USC's loan to him was made solely to facilitate his purchase of stock in Defendant UFC, the parent company of USC and former Defendant United Savings Bank of Wyoming. (Amended Complaint, ¶ 15.) Plaintiff alleges that he bought 5,000 shares of UFC preferred stock in January, 1985 by way of a subscription agreement provided to him by Keilly, who he claims was acting as an agent for UFC with the knowledge and approval of UFC. (Amended Complaint, ¶ 15). He further claims that he "either still owns" the stock or "has transferred the stock to the partnership" (i.e., Fiesta). (Amended Complaint, ¶ 34.) Subsequent to Plaintiff's purchase of the stock and assignment to Fiesta, Fiesta declared bankruptcy. Plaintiff further alleges both that this stock "is now substantially worthless" and that it was "valueless" at the time he purchased it, because of loan loss provisions disclosed in UFC's 1985 Form 10–K and subsequent public filings. (Amended Complaint, ¶¶ 34, 50, 56, 66.)

The essence of Plaintiff's claims is that UFC's 1983 annual report, 1983 Form 10–K and September 30, 1984 Form 10–Q contained untrue statements of material fact and omitted material facts, and that he "did not know" about these alleged untrue statements of material fact and omissions of material fact. (Amended Complaint, ¶¶ 30, 32.) Plaintiff claims that he "relied upon the material truthfulness" of these reports and upon "the implicit representations by Defendants that all material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading had been disclosed." (Amended Complaint, ¶ 39.) Plaintiff alleges that he has suffered harm as a result of his purchase of the UFC stock, and seeks rescission of his purchase of the securities or, in the alternative, money damages. (Amended Complaint, ¶¶ 34, 35, 41, 51, 56, 57, 68, 72).

Plaintiff's claims against Defendant McGill are based on McGill's former position as President of UFC. (Amended Complaint, ¶ 11).

Plaintiff has asserted claims for relief against McGill as follows: "Counts" II ("violation of Section 10(b) of the Exchange Act and Rule 10(b)(5) thereunder"), Count III ("Civil RICO violation"), Count V ("Common law Fraud"), and Count VII ("Civil Conspiracy").

Defendant McGill has denied Plaintiff's allegations. The parties have conducted discovery for more than two years. The final discovery cut-off was October 31, 1989. Additionally, the Court granted Plaintiff permission to reopen discovery after that date to conduct supplemental depositions of Defendant McGill and former Defendant Perlmutter.

On October 31, 1989, Defendant McGill filed his Motion to Dismiss and Motion for Summary Judgment together with supporting brief, affidavits and deposition transcripts. Plaintiff responded by filing points and authorities in opposition to the motions to dismiss and for summary judgment together with deposition transcripts and exhibits. Further, on March 20, 1990, Plaintiff filed a Motion for Leave to Supplement Plaintiff's Opposition to Defendants' Motions for Summary Judgment. This Motion was not timely filed, and the Court has denied it. Nevertheless, the Court has reviewed the Motion, the evidence and arguments contained therein and has considered

them in reaching its findings of fact and conclusions of law. Oral argument on these motions was heard on March 22, 1990.

## FINDINGS OF FACT

1. Plaintiff is a professional singer and entertainer who resides in Las Vegas, Nevada.

2. Defendant Uniwest Financial Corp. (herein "UFC") was a Colorado corporation. UFC was a savings and loan holding company, whose subsidiaries included Uniwest Trust Company, a Wyoming corporation. The common stock of defendant UFC was registered with the United States Securities and Exchange Commission.

3. United Savings Bank of Wyoming, F.S.B. ("United Savings") was a federal stock savings bank, chartered under the laws of the United States, and was a subsidiary of Uniwest Trust Company.

4. Uniwest Services Corp. ("USC") and Uniwest Mortgage Company ("UMC") were subsidiaries of United Savings and were engaged in the general equipment leasing business and the real estate mortgage business, respectively.

5. Gary H. McGill was president of United Savings from mid–1984 to June, 1987 and was president of UFC from 1982 until March, 1988.

6. In 1984, Plaintiff became aware of an investment opportunity involving the purchase of stock in UFC and an interest in Fiesta R.V. Resort, Ltd.

7. Fiesta R.V. Resort, Ltd. ("Fiesta") was a limited partnership formed for the purpose of developing an R.V. park in Bullhead City, Arizona.

8. Plaintiff learned of this investment opportunity from the law firm of Fahrenkopf, Mortimer, Sourwine, Mousel and Sloane of Reno, Nevada ("Fahrenkopf Firm") and consulted with that law firm concerning this investment opportunity.

9. Prior to and during 1984 and 1985 the Fahrenkopf Firm had been counsel to Plaintiff.

10. Prior to making his decision to invest, Plaintiff consulted with his counsel from the Fahrenkopf firm concerning the advisability of entering into this transaction. Plaintiff acknowledged in his deposition that he "was relying on the information given to [him] by Mr. Mousel [a member of the Fahrenkopf firm], and [he] relied on that totally." Mr. Newton stated that he "hired Mr. Mousel to look out for [his] interests with respect to this transaction so [he] wouldn't have to do any looking out for [his] own interests." Newton Deposition, p 96.

11. The limited partners of Fiesta were Plaintiff, John Keilly, a Las Vegas, Nevada promoter, as trustee for Centennial Mortgage Corporation Pension and Trust, John H. Pilkington, Curtis F. Osman, and 333 Investors, a Nevada partnership. The partners of 333 Investors were Plaintiff's attorneys—the members of the Fahrenkopf Firm.

12. To finance the purchase of the necessary land and to capitalize the limited partnership, the limited partners and the limited partnership entered into the following arrangement: (1) defendant USC and Buena Vista Bank made cash loans to the partners; (2) the partners took these cash proceeds and purchased shares of Series B Preferred Stock from defendant UFC; (3) the partners assigned their UFC Series B Preferred Stock to the partnership as their respective capital contributions; and (4) defendant UMC loaned Fiesta $2,100,000 to finance the purchase of the land for the R.V. park.

13. Plaintiff's loan from USC was $300,000. He also borrowed $200,000 from Buena Vista. He then used those proceeds to purchase 5,000 shares of UFC Series B Preferred Stock, which he then assigned to Fiesta as his capital contribution to the limited partnership. In exchange for that assignment, Plaintiff received a 22.41% interest in Fiesta.

14. Plaintiff's 5,000 shares of UFC Series B Preferred Stock were not worthless at the time he purchased them.

15. Plaintiff's lawyers from the Fahrenkopf Firm, Frank Fahrenkopf, David L.

Mousel, Julien G. Sourwine, Wayne L. Mortimer and Douglas L. Sloane, likewise borrowed $100,000 each, in their individual capacities, from Buena Vista to purchase 5,000 shares of UFC Series B Preferred Stock which they also assigned to Fiesta as the capital contribution of 333 Investors.

16. Mr. Fahrenkopf, Mr. Mousel, Mr. Sourwine, Mr. Mortimer and Mr. Sloane have repaid their loans from Buena Vista.

17. Plaintiff has never met or spoken with Defendant McGill.

18. Plaintiff made his purchase of UFC Series B Preferred Stock by way of a document entitled "Uniwest Financial Corp. Series B Preferred Stock Subscription Agreement and Investment Representation" ("Subscription Agreement"). That document recited that Plaintiff had been provided with the following: (1) UFC's 1983 Annual Report to the Shareholders ("1983 Annual Report"); (2) UFC's annual report on Form 10-K under the Securities Exchange Act of 1934 ("1983 10-K"); (3) UFC's quarterly report on Form 10-Q under the Securities Exchange Act of 1934 ("September 30, 1984 10-Q"); and (4) the Series B Preferred Stock Statement of Rights and Privileges.

19. Plaintiff acknowledges he did not read the 1983 Annual Report, the 1983 10-K, or the September 30, 1984 10-Q prior to purchasing the stock. Newton Deposition pp. 76–77.

20. Plaintiff did not rely on any statements made in the 1983 Annual Report, the 1983 10-K, the September 30, 1984 10-Q or the Series B Preferred Stock Statement of Rights and Privileges in reaching his decision to purchase the UFC Series B Preferred Stock. Instead, he relied upon the advice of his attorneys, the Fahrenkopf Firm.

21. Plaintiff claims there were misrepresentations of material facts and omissions of material facts in the 1983 Annual Report, the 1983 10-K, and the September 30, 1984 10-Q as detailed in paragraph 30 of his Amended Complaint. In general, Plaintiff claims that UFC's loan loss provisions were under-reported by approximately $11,000,000 in those documents and that

financial statements in those documents, therefore, did not conform with Generally Accepted Accounting Principles ("GAAP") applied on a consistent basis. The gravamen of Plaintiff's contention is that at least part of an $11,000,000 provision for loan losses on real estate loans which was reported in UFC's *1985* Form 10-K was identifiable by UFC's management in 1983 and the first nine months of 1984, and, thus, should have been disclosed in the 1983 and 1984 reports. Defendant disputes this.

22. The 1983 10-K, on its face, purports to be prepared in accordance with GAAP applied on a consistent basis. This representation is supported by UFC's certified public accountants, Main–Hurdman.

23. To support further his contention that the loan loss provisions were not under-reported, Defendant has filed the Affidavit of Daniel J. Nickless, a Certified Public Accountant licensed to practice in the State of Colorado, and the former Controller of UFC. In essence, Mr. Nickless states that, in his opinion, the 1983 Annual Report, the 1983 Form 10-K, and the September 30 1984 Form 10-Q accurately reflected UFC's loans, real estate owned and net loss and provided an allowance for loan losses necessary to fairly present the assets of UFC during the applicable time periods.

24. Further, Mr. Nickless' affidavit states that the $11,000,000 provision for losses on loans and real estate owned reported in UFC's 1985 Form 10-K was the result of many economic factors including, specifically, the general decline of real estate values in the Rocky Mountain Region, the impact of economic problems within the oil producing states, and the financial deterioration of many of Buena Vista' borrowers. These economic factors caused the Federal Home Loan Bank Board to order re-appraisals of the properties securing various loans. Those re-appraisals were begun in the Spring of 1986 and were not complete until August 1986. UFC's 1985 Form 10-K was filed with the Securities and Exchange Commission in October 1986.

25. The Nickless Affidavit establishes that the deterioration in value of UFC's loan portfolio and other assets of the company's subsidiaries was not identifiable by UFC's management in 1983 or 1984. On the contrary, the evidence establishes that the deterioration was not identifiable by UFC management until August, 1986 when the reappraisals were completed.

26. The Nickless Affidavit further establishes that the Financial information contained in the 1983 Annual Report, 1983 Form 10–K and September 30, 1984 Form 10–Q was presented in accordance with GAAP.

27. Defendant McGill did not personally participate in the preparation of any UFC financial statements or identifying the appropriate loan loss reserves for the 1983–1984 period. McGill Deposition pp. 31–32.

28. Defendant McGill reasonably relied in good faith on the UFC legal counsel and certified public accountants to prepare the financial material in the 1983 Annual Report, the 1983 Form 10–K, and the September 30, 1984 Form 10–Q to accurately present UFC's financial picture in accordance with GAAP. McGill Deposition pp. 31–32.

29. There has been no evidence presented by Plaintiff to indicate that Defendant McGill engaged in any reckless or intentional misconduct in connection with the preparation of the 1983 Annual Report, the 1983 Form 10–K, or the September 30, 1984 10–Q.

30. Plaintiff has produced no evidence by way of affidavit, deposition transcript or otherwise to support his contention that the loan loss provisions were materially under-reported or that the 1983 Annual Report, the 1983 Form 10–K, or the September 30, 1984 Form 10–Q were not prepared in accordance with GAAP.

31. The uncontroverted evidence demonstrates that UFC's 1983 Annual Report, 1983 Form 10–K and September 30, 1984 Form 10–Q contained no untrue statements of material fact and omitted no material facts.

32. Defendants contend that Plaintiff has not suffered any damages. Plaintiff purchased Series B Preferred Shares which he in turn used to obtain his 22.41% interest in Fiesta. Additionally, Plaintiff received a dividend on the stock in the amount of $60,000 which he also assigned to Fiesta. Plaintiff has failed to produce any evidence that he has suffered any recoverable damages.

## CONCLUSIONS OF LAW

33. This Court has jurisdiction pursuant to § 27 of the Securities Exchange Act of 1934; 15 U.S.C. § 78aa; 18 U.S.C. § 1964(a); 28 U.S.C. § 1331 and the doctrine of pendant jurisdiction.

34. The entry of summary judgment is appropriate when "the pleadings and affidavits, together with any other extraneous materials, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hershman v. Sierra Pacific Power Co.*, 434 F.Supp. 46, 48 (D.Nev. 1977) "The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to present evidence sufficient to support a verdict in its favor on every element of its claim for which it will carry the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. at 2552–53. "If the [nonmoving party's] evidence is ... not sufficiently probative summary judgment may be granted." *Anderson [v. Liberty Lobby, Inc.*], 477 U.S. [242] at 249–50, 106 S.Ct. [2505] at 2511 [91 L.Ed.2d 202]." *In Re Apple Computer Securities Litigation*, 886 F.2d 1109, 1113 (9th Cir. 1989). The Court must give the nonmoving party the benefit of all reasonable inferences that could be drawn from the facts. *Guam Federation of Teachers Local 1581, A.F.T. v. Ysrael*, 492 F.2d 438, 431 (9th Cir.1974) *cert. denied* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974).

35. To establish a claim under § 10(b) and Rule 10(b)–5 Plaintiff must es-

tablish five elements. First, that Defendant made an untrue statement of a material fact, or that he failed to state a material fact necessary to keep the statements that were made from being misleading under the circumstances. Second, that the Defendant acted with scienter. Third, that the Defendant used the mail or the telephone in connection with the subject transaction. Fourth, that Plaintiff reasonably relied on Defendant's untrue or misleading statements or his failure to state a material fact in purchasing or selling securities. Fifth, that Plaintiff suffered damages as a result. *Crocker–Citizens Nat. Bank v. Control Metals Corp.*, 566 F.2d 631, 635–36 (9th Cir.1977); *see also* Model Jury Instructions for the Ninth Circuit § 14.03A "Securities Act (15 U.S.C. § 77e Rule 106–5) Misrepresentations" (1985 ed.).

36. Plaintiff claims that the 1983 Annual Report, the 1983 Form 10–K, and the September 30, 1984 Form 10–Q contained materials misstatements and omissions. He claims that the loan loss reserves in those documents were understated by management, including Defendant McGill, and that these documents were not prepared in accordance with GAAP, and that, therefore, the financial condition of UFC was materially misrepresented. *See* Amended Complaint, ¶ 30.

37. Plaintiff has presented insufficient evidence for the Court to conclude that the 1983 Annual Report, the 1983 Form 10–K, or the September 30, 1984 Form 10–Q contained any misrepresentations of material fact or omitted to state any material facts necessary to make the statements made not misleading. Similarly, Plaintiff has presented insufficient evidence to conclude that those documents were not prepared in accordance with GAAP.

38. Defendant filed the Affidavit of Daniel J. Nickless, a Certified Public Accountant and former Controller of UFC, which stated that the 1983 Annual Report, the 1983 Form 10–K, and the September 30, 1984 10–Q accurately reflected UFC's loans, real estate owned and net loss and provided an allowance for loan losses nec-essary to fairly present the assets of UFC during the applicable time periods. Additionally, Mr. Nickless' Affidavit stated that the financial information in those documents was presented in accordance with GAAP.

39. Plaintiff has failed to present any evidence to contradict the Nickless Affidavit.

40. Because Defendant has demonstrated that there is no genuine issue as to whether the 1983 Annual Report, the 1983 Form 10–K and September 30, 1984 10–Q contained material misrepresentations or omitted material facts, he is entitled to summary judgment on Count II of Plaintiff's First Amended Complaint.

41. Alternatively, even if there were a genuine issue as to the existence of material misrepresentations or omissions, Defendant is entitled to summary judgment on Count II because Plaintiff has failed to establish the existence of a genuine issue as the required element of scienter as it relates to Defendant McGill.

42. To support a claim under Section 10(b) and Rule 10(b)–5, Plaintiff must establish that the alleged misrepresentations and omissions were made intentionally, recklessly or knowingly. Scienter, in this context, refers to a mental state embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668, 684 (1976).

43. The scienter element places the burden on Plaintiff to prove that "defendants either knew the misleading nature of their statements, or made the statements in reckless disregard of adverse facts that could have been disclosed without extraordinary effort." *In re Apple Computer Securities Litigation*, 672 F.Supp. 1552, 1753 (N.D.Cal 1987) *aff'd in part, rev'd in part* 886 F.2d 1109 (9th Cir.1989). Recklessness "has been defined as at the least, conduct which is 'highly unreasonable' and represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defen-

dant must have been aware of it.'" *In re Citisource, Inc. Securities Litigation*, 694 F.Supp. 1069, 1082 (S.D.N.Y.1988), *quoting Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.1978) and *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977).

44. Defendant McGill contends that he relied in good faith on the company's lawyers and certified public accountants to prepare the 1983 Annual Reports, 1983 Form 10–K, and September 30, 1984 Form 10–Q. (McGill Deposition, pp. 31–32).

45. Additionally, the Affidavit of Mr. Nickless demonstrates that the deterioration in value of UFC's loan portfolio and other assets of UFC was not identifiable by the Company's management in 1983 or 1984.

46. Unless the evidence demonstrates that there is a genuine issue as to whether the defendant acted in other than good faith, summary judgment is appropriate in a Section 10(b) and Rule 10b–5 case. *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1117 (9th Cir.1989).

47. Plaintiff has produced no evidence to counter Defendant's contention, based upon the evidence, that he acted in good faith reliance on the UFC lawyers and certified public accountants and without the requisite scienter.

48. Based upon the evidence before the Court there is no genuine issue that Defendant McGill did not act with the requisite scienter. For this reason, too, Defendant McGill is entitled summary judgment on Count II of the First Amended Complaint.

49. Lastly, assuming the existence of a material misrepresentation made with the requisite scienter on which Plaintiff justifiably relied, an additional element of a Section 10(b) and Rule 10(b)–5 claim is proof of damages. After purchasing the 5,000 shares of Series B Preferred Stock, Plaintiff assigned that stock to Fiesta in exchange for a 22.41% interest in that venture. In other words, Plaintiff sold his stock in exchange for his Fiesta interest. The stock, therefore, was not worthless at the time Plaintiff purchased it. Plaintiff received value for the stock upon disposition. Further, the evidence indicates that a dividend of $60,000 was paid on the Stock which Plaintiff assigned to Fiesta. Plaintiff has failed to establish that he suffered recoverable damages.

50. Count III of Plaintiff's First Amended Complaint alleges that Defendant McGill violated the Racketeer Influenced Corrupt Organizations Act 18 U.S.C. § 1961 *et seq.*

51. The gravamen of Plaintiff's RICO claim is that Defendant McGill committed two or more offenses involving fraud in the sale of securities—the predicate acts. Those offenses are claimed to be the acts forming the basis for the Section 10(b) and Rule 10b–5 claim in Count II of the Amended Complaint. (Amended Complaint ¶ 43).

52. Because the Court has concluded that summary judgment is appropriate with respect to the predicate acts, Plaintiff has failed to establish a genuine issue of fact as to an essential element of his RICO claim. Therefore, summary judgment is appropriate on Count III of the Amended Complaint.

53. Defendant McGill, in the alternative, has moved under F.R.C.P. 12(b)(6) to dismiss the RICO claim on the ground that the Amended Complaint fails to allege sufficient facts to establish the essential element of a "pattern of racketeering activity."

54. In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) the United States Supreme Court defined pattern of racketeering activity.

"In order to prove a pattern of racketeering activity a plaintiff or prosecutor must show at least two racketeering predicates that are related and that amount to, or threaten the likelihood of, continued criminal activity. Proof of neither relationship nor continuity requires a showing that the racketeering predicates were committed in furtherance of multiple criminal schemes ..."

55. Review of the Amended Complaint in the light most favorable to Plaintiff demonstrates that he has not alleged two racketeering predicates that are related and amount to or threaten the likelihood of continued criminal activity. Similarly, Plaintiff alleged no facts from which it can be inferred that the predicates were in furtherance of multiple criminal schemes.

56. The Court concludes that because Plaintiff has failed to allege adequately a pattern of racketeering activity, he has failed to state a RICO claim upon which relief can be granted and must be dismissed under Rule 12(b)(6).

57. In Count V of his Amended Complaint Plaintiff alleges that Defendant McGill's conduct constituted common law fraud. The Court concludes that this claim should be resolved under the law of the State of Nevada.

58. Plaintiff reiterates that the representations contained in the 1983 Annual Report, the 1983 10–K, and the September 30, 1984 10–Q were materially false and that Plaintiff relied upon them to his detriment in reaching his decision to purchase the Series B Preferred Stock.

59. Under Nevada law, the elements of a common law fraud claim are: (1) a false representation made by defendant, (2) knowledge or belief on the part of the defendant that the representation is false—or, that he has not a sufficient basis of information to make it; (3) an intention to induce plaintiff to act or to refrain from acting in reliance on the misrepresentation; (4) justifiable reliance upon the representation on the part of plaintiff in taking action or refraining from it; and (5) damage to plaintiff from such reliance. *Ries v. Olympian, Inc.*, 747 P.2d 910 (Nev.S.Ct.1988); *Sanguinetti v. Strecker*, 577 P.2d 404 (Nev.S.Ct.1978).

60. Defendant has demonstrated that there were no false representations to Plaintiff. Likewise, Defendant has demonstrated that he did not believe any representations were false and that he had a sufficient basis for all representations made. Finally, Defendant has established that Plaintiff did not suffer any recoverable damages, even if such misrepresentation and reliance were found.

61. Because Defendant has demonstrated that there is no genuine issue as to the essential elements of Plaintiff's common law fraud claim, he is entitled to summary judgment on Count V of the Amended Complaint.

62. Count VII of Plaintiff's Amended Complaint alleges that Defendants participated in a civil conspiracy "designed to defraud Mr. Newton by inducing him to borrow $500,000 to invest in UFC Preferred Stock (rather than as an equity contribution to Fiesta RV Resort), and by making a loan to Fiesta RV Resort in such a manner that Mr. Newton received valueless stock for his promise to pay $500,000 to USC and Buena Vista." (Amended Complaint ¶ 66) The Court has concluded that this claim, too, should be resolved under the law of the State of Nevada.

63. Under Nevada law, "[a]n actionable civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Collins v. Union Federal Savings and Loan*, 662 P.2d 610, 622 (Nev.S.Ct.1983).

64. Based upon the evidence before the Court, there is no evidence that Defendant McGill engaged in any concerted action to accomplish an unlawful objective for the purpose of harming Plaintiff.

65. The material allegations against Defendant McGill are that he, in his capacity as president of UFC, committed securities and common law fraud in connection with the sale of Series B Preferred Stock to Plaintiff.

66. Because the Court has found that Defendant has established that there is no actionable securities or common law fraud claim against McGill, the Court cannot conclude that there was a conspiracy to defraud Plaintiff.

67. Plaintiff's investment decision to purchase the stock and to assign that stock to Fiesta as his capital contribution to

that entity were induced by Plaintiff's attorneys, and not by Defendant McGill.

68. Plaintiff has produced no evidence from which the Court can conclude that there was a conspiracy to defraud or harm Plaintiff.

69. Because Defendant has demonstrated that there was no conspiracy to defraud or otherwise harm Plaintiff, summary judgment is appropriate in Defendant's favor on Count VII of the Amended Complaint.

### ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court Orders:

(i) Summary judgment shall enter in favor of Defendant Gary H. McGill and against Plaintiff Carson Wayne Newton on Counts II, III, V, and VII of Plaintiff's First Amended Complaint For Recission Damages and Injunctive Relief.

(ii) Costs shall be taxed against Plaintiff upon the timely filing and approval of a bill of costs.